# United States Court of Appeals
## For the First Circuit

Nos. 21-1297, 21-1379

MEDICAID AND MEDICARE ADVANTAGE PRODUCTS ASSOCIATION OF PUERTO
RICO, INC.; MMM HEALTHCARE, LLC; TRIPLE-S ADVANTAGE, INC.; MCS
ADVANTAGE, INC.; HUMANA HEALTH PLANS OF PUERTO RICO, INC.,

Plaintiffs, Appellees,

v.

DOMINGO EMANUELLI HERNÁNDEZ, in his official capacity as
Attorney General for the Commonwealth of Puerto Rico; MARIANO A.
MIER-ROMEU, in his official capacity as Puerto Rico Insurance
Commissioner,

Defendants, Appellants,

ASOCIACION DE HOSPITALES DE PUERTO RICO, INC.; MENNONITE GENERAL
HOSPITAL, INC.; SAN JORGE CHILDREN'S HOSPITAL, INC.; HOSPITAL
MENONITA CAGUAS, INC.; HOSPITAL MENONITA GUAYAMA, INC.; PUERTO
RICO COLLEGE OF PHYSICIANS-SURGEONS; CLINICAL LABORATORIES
ASSOCIATION INC.; PUERTO RICO ASSOCIATION OF RADIOLOGY IMAGING
CENTERS INC.,

Intervenors, Appellants.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Silvia Carreño-Coll, U.S. District Judge]

Before

Lipez, Howard, and Thompson,
Circuit Judges.

Mariola Abreu-Acevedo, Assistant Solicitor General, with whom Fernando Figueroa-Santiago, Solicitor General of Puerto Rico, Omar Andino-Figueroa, Deputy Solicitor General, and Carlos Lugo-Fiol were on brief, for defendant-appellants.

César T. Alcover, Carla S. Loubriel Carrión, Casellas Alcover & Burgos, P.S.C., Luis Sánchez Betances, Jaime Sifre Rodríguez, Jorge Flores de Jesús, Sánchez Betances, Sifre & Muñoz Noya, Omar E Martinez-Vázquez, Martinez & Martinez, Luis E. Romero Nieves, Luis M. Pellot-Juliá, and Pellot-González, P.S.C. on brief for intervenor-appellants.

Michael B. Kimberly, with whom Ankur J. Goel, Sarah P. Hogarth, McDermott Will & Emery LLP, Luis R. Román-Negrón, SBGB LLC, Roberto L. Prats-Palerm, RPP Law, José A. Hernández-Mayoral, Hernández Mayoral Law Office, Mariacté Correa-Cestero, Ricardo José Casellas-Santana, O'Neill & Borges LLC, Herman Colberg, and Pietrantoni Méndez & Alvarez LLC were on brief, for appellees.

---

January 18, 2023

---

**LIPEZ**, **Circuit Judge**.  Facing an exodus of healthcare providers from Puerto Rico for more lucrative employment in the continental United States, the Puerto Rico legislature passed Act 90, which requires that Medicare Advantage plans compensate healthcare providers in Puerto Rico at the same rate as providers are compensated under traditional Medicare.  After several entities that manage Medicare Advantage plans challenged the law, the district court determined in a thoughtful decision that Act 90 is preempted by federal law.  We affirm.

**I.**

**A.  Medicare Advantage Program**

The federal Medicare program, established by Title XVIII of the Social Security Act, provides health insurance coverage to people 65 years of age or older and certain other qualifying beneficiaries, such as people with disabilities.  See 42 U.S.C. § 1395c; Akebia Therapeutics, Inc. v. Azar, 976 F.3d 86, 89 (1st Cir. 2020).  The Secretary of the Department of Health and Human Services ("HHS") administers the Medicare program through the Centers for Medicare and Medicaid Services ("CMS"), an agency housed within HHS.  See Visiting Nurse Ass'n Gregoria Auffant, Inc. v. Thompson, 447 F.3d 68, 70 (1st Cir. 2006).  Under the "traditional" Medicare program (Parts A and B), the federal government pays healthcare providers directly for a limited array of specified services according to a fee-for-service schedule set

- 3 -

by CMS. See First Med. Health Plan, Inc. v. Vega-Ramos, 479 F.3d 46, 48 (1st Cir. 2007); 42 U.S.C. §§ 1395c to 1395i-6 (Part A); 42 U.S.C. §§ 1395j to 1395w-6 (Part B).

The Medicare Advantage program, also known as Medicare Part C, which is governed by the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 ("Medicare Advantage Act"), Pub. L. No. 108-173, 117 Stat. 2066 (2003) (codified at 42 U.S.C. §§ 1395w-21 to 1395w-28), takes a different approach. Under Medicare Advantage, CMS contracts with private organizations -- Medicare Advantage Organizations ("MAOs"), essentially private insurers -- who in turn contract with healthcare providers to supply core Medicare services as well as additional benefits, such as hearing and dental care, which fall outside of the traditional Medicare program. See UnitedHealthcare Ins. Co. v. Becerra, 16 F.4th 867, 872-73 (D.C. Cir. 2021).

Congress established the Medicare Advantage program to expand the availability of private health plan options to Medicare beneficiaries while generating cost savings for both the federal government and for enrollees through market competition and the greater use of managed care. See Medicare Program; Establishment of the Medicare Advantage Program, 70 Fed. Reg. 4588, 4589 (Jan. 28, 2005) (codified at 42 C.F.R. pts. 417, 422). The Medicare Advantage program aims to achieve these purposes through several interrelated policies. Most relevant to this appeal, MAOs

negotiate payment and network-inclusion terms with in-network healthcare providers rather than paying these providers according to a fixed fee-for-service schedule as under traditional Medicare. See generally 42 U.S.C. § 1395w-23(a); 42 C.F.R. § 422.520(b)(2). In lieu of fixed fee-for-service reimbursements, MAOs generally receive a per-beneficiary monthly payment in return for providing coverage to Medicare Advantage enrollees for all traditional Medicare services as well as additional services outside the traditional Medicare program. 42 U.S.C. § 1395w-23(b). Acting through CMS, the Secretary of HHS determines an MAO's monthly payment by comparing its bid -- the cost that the MAO estimates for providing Medicare-covered services -- to a federal benchmark, the maximum amount the federal government will pay under traditional Medicare for providing those services in the plan's geographic service area.[1] See id.; UnitedHealthcare Ins. Co., 16 F.4th at 872-73.

_____

[1] If the bid an MAO plan tenders is less than the federal benchmark, CMS pays the MAO its bid plus a rebate, which must be returned to enrollees in the form of additional benefits or coverage for services outside of traditional Medicare, such as dental or hearing benefits. 42 U.S.C. §§ 1395w-23(a)(1)(B)(i), (E); 1395w-24(b)(1)(C). If the MAO plan's bid is equal to or above the federal benchmark, the compensation that the MAO receives from CMS is the benchmark amount, and each enrollee in that plan will incur an additional premium to cover the amount by which the bid exceeds the federal benchmark. Id. §§ 1395w-23(a)(1)(B)(ii), 1395w-24(b)(1)(A), 1395w-24(b)(2)(C). During open enrollment season, beneficiaries choose from among MAO plan offerings and MAOs compete against one another for beneficiaries by providing additional or supplemental benefits to those offered by

The Medicare Advantage Act also prohibits the Secretary of HHS from modifying this payment approach, providing that

> [i]n order to promote competition under this part . . . the Secretary may not require any [MAO] to contract with a particular hospital, physician, or other entity or individual to furnish items and services under this subchapter <u>or require a particular price structure for payment under such a contract</u> . . . .

42 U.S.C. § 1395w-24(a)(6)(B)(iii) (emphasis added). Lastly, but crucially for purposes of this appeal, the Medicare Advantage Act contains the following preemption clause:

> The standards established under this part shall supersede any State law or regulation (other than State licensing laws or State laws relating to plan solvency) with respect to [Medicare Advantage] plans which are offered by [Medicare Advantage] organizations under this part.

42 U.S.C. § 1395w-26(b)(3).

## B. Puerto Rico Act 90

In 2019, the Legislative Assembly of Puerto Rico passed, and the Governor signed into law, Act 90-2019 ("Act 90"), which requires that MAOs pay Puerto Rico healthcare providers no less than the fixed fee-for-service Medicare reimbursement rate. Act 90-2019, 2019 P.R. Laws 660 (codified at P.R. Laws Ann. tit. 26,

---

traditional Medicare, broader access to in-network providers, or lower out-of-pocket costs as compared to other MAOs. <u>See</u> Medicare Program; Establishment of the Medicare Advantage Program, 70 Fed. Reg. at 4589. Thus, under Medicare Advantage's market-oriented approach, MAOs assume the risk of individual beneficiaries' health care costs.

§ 1915(7)). The legislation, which amends the Puerto Rico Insurance Code, is an "attempt to address a major public health crisis afflicting the island for more than a decade: the mass exodus of medical professionals in pursuit of better economic opportunity elsewhere in the United States." Medicaid & Medicare Advantage Prods. Ass'n of P.R. v. Emanuelli-Hernández, Civ. No. 19-1940 (SCC), 2021 WL 792742, at *1 (Mar. 1, 2021).[2] As the Puerto Rico Senate explained in the bill that became Act 90, a significant factor in this severe retention problem is that even traditional Medicare's fee-for-service rates "established by CMS for Puerto Rico physicians are lower than those established for physicians in any other state or territory of the United States." Id. at *8. Further, under Medicare Advantage, "insurers in Puerto Rico . . . pay rates even below the already-low rates paid by CMS under [traditional] Medicare, thus encouraging the flight of medical professionals to other jurisdictions where reimbursement rates are higher." Id. With Act 90, the Puerto Rico legislature sought to encourage medical professionals to remain in Puerto Rico "by eliminating insurers' practice of paying providers below the

_____

[2] In Act 90's Statement of Motives, the Puerto Rico legislature asserted that "[f]or the 2009-2014 period, there was an average annual loss of 472 physicians and 347 medical specialists in Puerto Rico. In 2016, nearly 600 physicians cancelled their Puerto Rico licenses to move to the United States." Act 90, 2019 P.R. Laws at 661.

- 7 -

minimum reimbursement rates paid by CMS under [traditional] Medicare." Id.

To that end, Act 90 requires MAOs to pay Medicare Advantage providers in Puerto Rico at least as much as the federal government would compensate those entities under the corresponding fee-for-service schedule set by CMS for traditional Medicare services. Referred to as the "Mandated Price Provision," subsection 7 of section 1 states, in relevant part:

> No agreement, contract, addendum, or stipulation between a Medicare Advantage health service organization . . . and a service provider, relating to the services offered to Medicare Advantage shall include a clause providing for the payment of fees that are less favorable for the service provider or lower than those established in the fee-for-service schedule developed annually by . . . [CMS] for Puerto Rico.

P.R. Laws Ann. tit. 26, § 1915(7). The Mandated Price Provision provides that "[a]ny condition, stipulation or agreement [between an MAO and a service provider] that is inconsistent with [the provision] shall be deemed void." Id.

## C. District Court Proceedings

Shortly after Act 90 became law, appellees, a trade organization representing MAOs and several individual MAOs, filed suit seeking a declaratory judgment and an injunction barring enforcement of the Mandated Price Provision.[3] In their complaint,

---

[3] On appeal, the government appellants initially challenged the district court's determination that Act 90's termination

appellees asserted that the Medicare Advantage Act preempts the challenged provision, and that the provision also violates the U.S. Constitution's Contract and Takings Clauses. Appellants, the Attorney General and the Insurance Commissioner of Puerto Rico, moved to dismiss the complaint arguing, in relevant part, that the provision is not preempted and that the suit should therefore be dismissed for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). Various hospitals and organizations representing healthcare professionals in Puerto Rico -- the intervenor-appellants -- intervened as a matter of right pursuant to Federal Rule of Civil Procedure 24(a)(2).

Appellees opposed the motion to dismiss and cross-moved for partial summary judgment on the preemption claim. The district court ultimately ruled in favor of the appellees, holding that the Medicare Advantage Act expressly preempts the Mandated Price Provision in Act 90. The district court therefore denied appellants' motion to dismiss and granted appellees' summary judgment motion as a motion for judgment on the pleadings. This appeal followed.[4]

---

provision -- which prohibits MAOs from terminating providers without just cause -- was also preempted by federal law. At oral argument, however, counsel for appellants conceded that this provision is preempted by the Medicare Advantage Act's preemption clause and the regulations governing the termination of provider contracts by MAOs. See 42 C.F.R. § 422.202(d).

[4] The government appellants and the intervenor-appellants filed separate appeals, which this court consolidated. See Fed.

The Supremacy Clause of the U.S. Constitution, which makes federal law "the supreme Law of the Land," U.S. Const. art. VI, cl. 2, means that Congress "has the power to pre-empt state law." Me. Forest Prods. Council v. Cormier, 51 F.4th 1, 6 (1st Cir. 2022) (quoting Arizona v. United States, 567 U.S. 387, 399 2012)). The test for federal preemption of a Puerto Rico law is the same as the test under the Supremacy Clause for preemption of the law of a state. P.R. Dep't of Consumer Affairs v. Isla Petroleum Corp., 485 U.S. 495, 499 (1988).

Federal preemption of state law "may be either expressed or implied, and is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose." Gade v. Nat'l Solid Wastes Mgmt. Ass'n, 505 U.S. 88, 98 (1992) (internal quotation marks omitted). Where a federal statute contains a clause expressly purporting to preempt state law, "we focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' preemptive intent." Chamber of Com. of U.S. v. Whiting, 563 U.S. 582, 594 (2011) (internal quotation marks omitted). Congressional "intent 'is the ultimate touchstone' of an express preemption analysis." First Med. Health Plan, Inc. v.

R. App. P. 3(b)(2).

Vega-Ramos, 479 F.3d 46, 51 (1st Cir. 2007) (quoting Medtronic, Inc. v. Lohr, 518 U.S. 470, 485 (1996)).

As we have explained, "[i]n determining the preemptive scope of a congressional enactment, [we] rely on the plain language of the statute and its legislative history to develop a reasoned understanding of the way in which Congress intended the statute to operate." Id. (internal quotation marks omitted). Further, to determine "whether a Federal act overrides a state law, the entire scheme of the statute must . . . be considered . . . . If the purpose of the act cannot otherwise be accomplished -- if its operation within its chosen field [would] be frustrated and its provisions be refused their natural effect -- the state law must yield to the regulation of Congress within the sphere of its delegated power." Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 373 (2000) (quoting Savage v. Jones, 225 U.S. 501, 533 (1912)).

## III.

The question before us, then, is whether the Medicare Advantage Act's preemption clause applies to Act 90's Mandated Price Provision, such that the provision is expressly preempted by federal law. We review de novo a district court's grant of judgment on the pleadings. Perez-Acevedo v. Rivero-Cubano, 520 F.3d 26, 29 (1st Cir. 2008). Moreover, "a federal preemption ruling presents a pure question of law subject to plenary review."

- 11 -

<u>United States</u> v. <u>R.I. Insurers' Insolvency Fund</u>, 80 F.3d 616, 619 (1st Cir. 1996). "The burden to prove preemption is on the plaintiffs." <u>Capron</u> v. <u>Off. of Att'y Gen. of Mass.</u>, 944 F.3d 9, 21 (1st Cir. 2019).

We begin with a threshold issue: whether the presumption against preemption applies. This substantive canon of construction, as explained by the Supreme Court, means that federal law should not be interpreted to preempt state law "unless that was the clear and manifest purpose of Congress." <u>Rice</u> v. <u>Santa Fe Elevator Corp.</u>, 331 U.S. 218, 230 (1947). However, the Supreme Court has also recently stated that where a "statute contains an express pre-emption clause, [courts] do not invoke any presumption against pre-emption." <u>Puerto Rico</u> v. <u>Franklin Cal. Tax-Free Tr.</u>, 579 U.S. 115, 125 (2016) (internal quotation marks omitted). Although appellants offer various arguments, based on pre-<u>Franklin</u> case law, that the presumption should apply in this case, the Supreme Court's broad language in <u>Franklin</u> forecloses us from applying the presumption against preemption in interpreting the Medicare Advantage Act's express preemption clause.[5]

_____

[5] In applying <u>Franklin</u>'s broad language outside that case's specific context of the Bankruptcy Code's preemption clause, we join other circuit courts that have applied <u>Franklin</u> to other statutes. <u>See</u>, <u>e.g.</u>, <u>Pharm. Care Mgmt. Ass'n</u> v. <u>Wehbi</u>, 18 F.4th 956, 967 (8th Cir. 2021) (applying <u>Franklin</u> to ERISA and to Medicare Part D's preemption provision, which is identical to 42 U.S.C. § 1395w-26(b)(3)); <u>Dialysis Newco, Inc.</u> v. <u>Cmty. Health Sys. Grp. Health Plan</u>, 938 F.3d 246, 258-59 (5th Cir. 2019)

- 12 -

Turning to that preemption clause, we conclude that the plain language and legislative history demonstrate Congress's intent to preempt a state law like Act 90's Mandated Price Provision. As the district court noted, the preemption clause's use of the "modifying term 'any' before 'State law or regulation' and the inclusion of two listed exceptions" suggest "that Congress intended for all state laws or regulations that purport[] to regulate [Medicare Advantage] plans offered by MAOs . . . [to be] preempted." Medicaid and Medicare Advantage Prods. Ass'n of P.R., 2021 WL 792742, at *9. That is, the clause's plain language sweeps broadly and would certainly encompass a state law, like the Mandated Price Provision, that specifically attempts to govern Medicare Advantage's payment structure.

The legislative history of the preemption clause confirms that Congress intended to broadly preempt state laws regarding Medicare Advantage plans. Prior to its amendment in 2003, the preemption clause read as follows:

> The standards established under this subsection shall supersede any State law or regulation . . . with respect to [Medicare Part C] plans . . . to the extent that such

---

(applying Franklin to ERISA); EagleMed LLC v. Cox, 868 F.3d 893, 899, 903 (10th Cir. 2017) (applying Franklin to the Airline Deregulation Act's express preemption clause); Watson v. Air Methods Corp., 870 F.3d 812, 817 (8th Cir. 2017) (en banc) (same). But see Shuker v. Smith & Nephew, PLC, 885 F.3d 760, 771 n.9 (3d Cir. 2018) (declining to apply Franklin to the Food, Drug, and Cosmetic Act because the case involved products liability claims historically regulated by the states).

law or regulation is inconsistent with such standards. . . .

42 U.S.C. § 1395w-26(b)(3)(A) (2002); Balanced Budget Act of 1997, Pub. L. No. 105-33, § 1856(b)(3)(A), 111 Stat. 251, 319; see also Mass. Ass'n of Health Maint. Orgs. v. Ruthardt, 194 F.3d 176, 178 (1st Cir. 1999). The 2003 amendment removed the requirement that a state law be "inconsistent with" federal standards to be preempted. See Medicare Advantage Act § 232(a). As the Eighth Circuit recently commented, "the effect of the 2003 amendment was to expand the scope of express Medicare preemption from conflict preemption to field preemption." Pharm. Care Mgmt. Ass'n v. Wehbi, 18 F.4th 956, 971 (8th Cir. 2021).

While we are not sure that the labels of "conflict" and "field" preemption are especially helpful where, as here, we seek to determine congressional intent behind an express preemption clause, we agree with the Eighth Circuit that the amendment clearly expanded the scope of preemption beyond those laws that directly conflict with federal standards. Indeed, CMS has noted that the 2003 amendment "relieves uncertainty of which State laws are preempted by 'preempting the field' of State laws [apart from the two noted exceptions of licensing and solvency laws]." Medicare Program; Establishment of the Medicare Advantage Program, 70 Fed. Reg. at 4694. Moreover, CMS observed that the 2003 amendment "reversed" the presumption that a conflict is required for

- 14 -

preemption, and noted that under the current provision, state laws that in any way relate to Medicare Advantage "standards" are "presumed to be preempted unless they relate to licensure or solvency." Medicare Program; Medicare Prescription Drug Benefit, 70 Fed. Reg. 4194, 4319 (Jan. 28, 2005) (codified at 42 C.F.R. pts. 400, 403, 411, 417, 423). In short, the Medicare Advantage Act's preemption clause does what it purports to do: it extends preemption to "any State law or regulation (other than State licensing laws or State laws relating to plan solvency) with respect to [Medicare Advantage] plans." 42 U.S.C. § 1395w-26(b)(3).

There is another important indication that Congress intended to preclude states from dictating price structures under Medicare Advantage. In a clause entitled "Noninterference," the Medicare Advantage Act provides:

> In order to promote competition under this part . . . the Secretary [of HHS] may not require any [Medicare Advantage] organization to contract with a particular hospital, physician, or other entity or individual to furnish items and services under this subchapter <u>or require a particular price structure for payment under such a contract</u> . . . .

42 U.S.C. § 1395w-24(a)(6)(B)(iii) (emphasis added). This provision only specifically constrains the ability of a federal agency -- HHS -- to dictate the price structure for Medicare Advantage contracts. It stands to reason, however, that if Congress has precluded HHS from dictating the pricing structure to

- 15 -

achieve Medicare Advantage's goal of promoting competition, it would not have intended to allow states to do so.

Commentary in the Federal Register further supports a conclusion that the Medicare Advantage Act was intended to preempt state laws dictating pricing structures under the Medicare Advantage program. For example, CMS has explicitly noted that "payments for local and regional [Medicare Advantage] plans will be based on competitive bids rather than administered pricing." Medicare Program; Establishment of the Medicare Advantage Program, 70 Fed. Reg. at 4589 (emphasis added). Thus, when the preemption clause is considered in the context of Medicare Advantage's regulatory scheme, it is apparent that Congress intended to prohibit all governmental bodies -- federal and state -- from dictating compensation for in-network providers, allowing MAOs the flexibility to compete with one another for enrollees. See id.

Appellants concede that, after the 2003 amendment, the Medicare Advantage Act's preemption provision "does not require a conflict (i.e., inconsistency) between state and federal standards for preemption to occur." However, they read the preemption clause to still require the existence of a federal "standard" that specifically "addresses the subject of the state regulation." In other words, appellants contend that the Medicare Advantage Act's preemption clause does not supersede Act 90's Mandated Price Provision because neither the Medicare Advantage Act nor federal

regulations supply a "specific, overlapping federal standard" governing MAO pricing structures. Appellants' position is both factually and legally unavailing.[6]

First, the standards establishing Medicare Advantage's competitive bidding system and forbidding administered pricing, discussed above, are federal standards addressing the subject of the Mandated Price Provision. Second, requiring the existence of a more specific standard would mean, for all intents and purposes, limiting the preemption clause to cases of direct "conflict" preemption, which, as we have explained, is an approach foreclosed by the preemption clause's plain statutory language (preempting "any State law or regulation") and the history of the 2003 amendment. Third, while it is true that Congress has not specifically prevented states from dictating pricing structures, as it has done with respect to the federal government itself, see 42 U.S.C. § 1395w-24(a)(6)(B)(iii), requiring the existence of a standard explicitly prohibiting states from regulating MAO pricing structures would largely eviscerate the effect of the expansive preemption clause.

------

[6] Neither the statute nor regulations define the term "standards" in the Medicare Advantage Act's preemption clause, nor have we done so. We agree with the Eighth Circuit that "standards" in this context should be understood simply to mean "statutory provision[s] or . . . regulation[s] promulgated under [Medicare Advantage] and published in the Code of Federal Regulations." Wehbi, 18 F.4th at 971.

Finally, and perhaps most importantly, although the Medicare Advantage Act's preemption clause sweeps more broadly than conflict preemption, it is clear that Act 90's Mandated Price Provision does indeed "conflict" with the federal statutory and regulatory regime -- in other words, the federal standards -- created to ensure that Medicare Advantage contracts "will be based on competitive bids rather than administered pricing." Medicare Program; Establishment of the Medicare Advantage Program, 70 Fed. Reg. at 4589 (emphasis added). As appellees note, "[t]he Mandated Price Provision regulates with respect to [Medicare Advantage] plans in the same area as -- indeed (though not required for preemption), in direct conflict with -- . . . federal standards by requiring [Medicare Advantage] plans to pay providers at least as much as the federal government would pay under traditional Medicare." In short, whatever preemption terminology is used, the Mandated Price Provision is preempted by the plain language of the Medicare Advantage Act's express preemption clause and the Congressional intent it evinces.

## IV.

We do not minimize the seriousness of the threat Puerto Rico faces from the flight of medical professionals. Nor do we overlook the difficulties Puerto Rico faces in addressing this crisis. But on the specific question of whether Act 90's Mandated

Price Provision is preempted by federal law, the answer is clear.

We therefore affirm the judgment of the district court.

<u>So ordered.</u>  <u>Each side to bear its own costs.</u>