# IN THE SUPREME COURT OF CALIFORNIA

LARRY QUISHENBERRY,
Plaintiff and Appellant,

v.

UNITEDHEALTHCARE, INC., et al.,
Defendants and Respondents.

S271501

Second Appellate District, Division Seven
B303451

Los Angeles County Superior Court
BC631077

July 13, 2023

Justice Groban authored the opinion of the Court, in which Chief Justice Guerrero and Justices Corrigan, Liu, Kruger, Jenkins, and Evans concurred.

QUISHENBERRY v. UNITEDHEALTHCARE, INC.

S271501


Opinion of the Court by Groban, J.


This case concerns a Medicare Advantage (MA) enrollee who died after being discharged from a skilled nursing facility. The enrollee's son, Larry Quishenberry, sued the MA health maintenance organization (HMO) plan and a healthcare services administrator that managed his father's MA benefits. Quishenberry pled state-law claims for negligence, wrongful death, and elder abuse based on allegations that the HMO and healthcare services administrator breached a duty to ensure his father received skilled nursing benefits to which he was entitled under his MA plan.

The HMO and healthcare services administrator assert that Quishenberry's claims are expressly preempted by Medicare Part C's preemption provision, which provides that the "standards established under" Part C "shall supersede any State law or regulation" concerning MA plans. (42 U.S.C. § 1395w-26(b)(3).) Because Quishenberry's state-law claims are based on allegations that his father's HMO plan and healthcare services administrator breached state-law duties that incorporate and duplicate standards established under Part C, we agree and hold that the provision preempts them.

## I. Background

### A. Medicare Part C

The Medicare Act, part of the Social Security Act, provides for a federally subsidized health insurance program administered by the Centers for Medicaid and Medicare Services (CMS), a division of the Department of Health and Human Services. (*McCall v. PacifiCare of Cal., Inc.* (2001) 25 Cal.4th 412, 416 (*McCall*).) "Under Parts A and B of the Act, Medicare beneficiaries requiring medical services obtain those services directly from providers participating in the Medicare program, and [Medicare] directly reimburses those providers on a 'fee-for-service' basis." (*Roberts v. United Healthcare Services, Inc.* (2016) 2 Cal.App.5th 132, 140 (*Roberts*); 42 U.S.C. §§ 1395c–1395i-5 [Part A] & 1395j–1395w-6 [Part B].) "Part A covers 'hospital, skilled nursing, home health, and hospice care benefits,' while Part B covers 'physician and other outpatient services.' " (*Roberts*, at p. 140.)

Part C — under which Quishenberry's father was insured — permits Medicare beneficiaries to "sign up for a privately administered health care plan" — an MA plan — "that provides all of the Part A and B benefits as well as additional benefits." (*Roberts*, *supra*, 2 Cal.App.5th at p. 140.) "If a beneficiary elects to participate in [an MA] plan, the government pays the plan's administrator a flat, monthly fee to provide all Medicare benefits for that beneficiary. Because Part C limits the government's responsibility to just the monthly fee, the private health plan — rather than the government — ends up 'assum[ing] the risk associated with insuring' the beneficiary." (*Ibid.*)

MA plans are governed by standards set out in Part C and in detailed federal regulations.  As described below, these standards comprehensively address MA plans' coverage of skilled nursing care.  (See post, section III.C.)

## B.  Factual and Procedural History

This case comes to us on review of a trial court order sustaining demurrers of the HMO plan and healthcare services administrator to Quishenberry's second amended complaint. We take the relevant facts from that complaint.  (*Yvanova v. New Century Mortgage Corp.* (2016) 62 Cal.4th 919, 924.)

According to the complaint, a hospital transferred Quishenberry's 85-year-old father to a skilled nursing facility for physical therapy after treating him for a broken hip.  Due to the neglect of the nursing facility and his physician there, Quishenberry's father developed severe pressure sores, which the facility and physician did not properly treat.[1]  After about 24 days at the skilled nursing facility, Quishenberry's father was discharged to his home, where he received inadequate care, experienced pain and suffering, and eventually died.

Quishenberry alleges his father was enrolled in an MA HMO plan offered by UnitedHealthcare, Inc., UnitedHealth Group Incorporated, UnitedHealthcare Services, Inc., and UHC of California (collectively, UnitedHealthcare). UnitedHealthcare contracted with Healthcare Partners Medical Group (Healthcare Partners) to administer the MA plan with

---

[1]    Quishenberry also sued the skilled nursing facility and his father's physician.  He settled with the skilled nursing facility, and the physician's defenses are not at issue in this appeal.

respect to physician services, delegating to Healthcare Partners its duty under the plan to provide such services.

According to the complaint, Quishenberry's father was entitled under Medicare to 100 days of medically necessary care at a skilled nursing facility — 76 additional days beyond the 24 days he received. However, his father's skilled nursing facility and treating physician, acting pursuant to standard business practices of UnitedHealthcare and Healthcare Partners, falsely informed his father that he was not entitled to further inpatient care and prematurely discharged him to his home.

Quishenberry further alleges that UnitedHealthcare had "responsibility for the custodial care and treatment" of his father by contract with CMS. "By contract and federal law," UnitedHealthcare and Healthcare Partners were able to control the skilled nursing facility, and they knew the facility was not providing Medicare-covered, medically necessary skilled nursing care to its resident-patients. Nevertheless, they "acquiesced to, encouraged, directed, aided and abetted" the facility and physician in discharging Quishenberry's father "under circumstances where acceptable medical practice and Medicare rules required" that his father remain at the facility "for more intense attention to his health care needs." Quishenberry alleges they did so "to increase profit by reducing the cost of providing" skilled nursing facility care.

Based on these allegations, Quishenberry pled — as relevant here — a state statutory claim under the Elder Abuse Act and common law claims of negligence and wrongful death.[2]

---

[2]   Quishenberry also pled a bad faith claim, but he does not dispute the dismissal of that claim, so it is not at issue.

UnitedHealthcare and Healthcare Partners — the only defendants involved in this appeal — demurred to the second amended complaint, arguing that Quishenberry's claims were preempted by Medicare Part C's preemption provision. The trial court sustained the demurrers without leave to amend and entered judgment in their favor.

Quishenberry appealed, and the Court of Appeal affirmed, concluding that the Part C preemption provision preempted Quishenberry's claims. The Court of Appeal relied on *Roberts, supra*, 2 Cal.App.5th 132, which disagreed with earlier Court of Appeal decisions that concluded the provision does not expressly preempt either common law claims — such as Quishenberry's negligence and wrongful death claims — or statutory claims that are based on generally applicable law, such as Quishenberry's claim under the Elder Abuse Act. (See *Yarick v. PacifiCare of California* (2009) 179 Cal.App.4th 1158, 1165–1166 (*Yarick*) [observing that language like that of the Part C preemption provision "usually is interpreted to preempt only 'positive state enactments,' that is, laws and administrative regulations, but not the common law"]; *Cotton v. StarCare Medical Group, Inc.* (2010) 183 Cal.App.4th 437, 450–452 (*Cotton*) [holding Part C preemption provision reaches only state statutes and regulations relating to MA plans].) We granted review to address whether the Part C preemption provision reaches Quishenberry's claims.

## II. Discussion

The question before us is whether the state-law duties Quishenberry seeks to enforce via his statutory claim of elder abuse and common law claims of negligence and wrongful death are superseded by "standards established under" Medicare Part

C, and thus expressly preempted by the Part C preemption provision. (42 U.S.C. § 1395w-26(b)(3).) Because deciding this question requires us to interpret the preemption provision and apply it to the claims Quishenberry alleges in his complaint, our review is de novo. (*Farm Raised Salmon Cases* (2008) 42 Cal.4th 1077, 1089, fn. 10; see also *McCall, supra,* 25 Cal.4th at p. 415.)

## A. Preemption Principles

The United States Supreme Court has explained the basic operation of federal preemption as follows: "Congress enacts a law that imposes restrictions or confers rights on private actors; a state law confers rights or imposes restrictions that conflict with the federal law; and therefore the federal law takes precedence and the state law is preempted." (*Murphy v. NCAA* (2018) 138 S.Ct. 1461, 1480.) Preemption can be "express" or "implied." The term express preemption refers to Congress's use of "express language in a statute" to supersede state law. (*Oneok, Inc. v. Learjet, Inc.* (2015) 575 U.S. 373, 376.) Whether Congress has expressly preempted a state-law claim is primarily a question of statutory construction. (*Medtronic, Inc. v. Lohr* (1996) 518 U.S. 470, 484 (*Medtronic*).)

When addressing such questions, we look first to the language of the preemption provision in its statutory context, " 'which necessarily contains the best evidence of Congress' pre-emptive intent.' " (*Sprietsma v. Mercury Marine* (2002) 537 U.S. 51, 62–63 (*Sprietsma*).) If we determine Congress intended a provision "to pre-empt at least some state law," our task becomes to identify " 'the domain expressly pre-empted.' " (*Medtronic, supra*, 518 U.S. at p. 484; see also *Quesada v. Herb Thyme Farms, Inc.* (2015) 62 Cal.4th 298, 308 (*Quesada*).)

Congress's objectives in enacting the statute may serve as a "guide" for discerning "the scope of the state law that Congress understood would survive" preemption and for determining whether a particular state-law duty is within that scope. (*Rutledge v. Pharm. Care Mgmt. Ass'n* (2020) 141 S.Ct. 474, 480 [\_\_\_ U.S. \_\_\_, \_\_\_].)[3]

### B. The Scope of the Medicare Part C Preemption Provision

In accordance with the principles outlined above, we begin our analysis with the plain language of Medicare Part C's preemption provision. (*Quesada, supra*, 62 Cal.4th at p. 308.) The provision reads in full: "The standards established under this part shall supersede any State law or regulation (other than State licensing laws or State laws relating to plan solvency) with respect to MA plans which are offered by MA organizations under this part." (42 U.S.C. § 1395w-26(b)(3).) Although the term "standards" is not defined in the Medicare Act, we understand the phrase "[t]he standards established under this part" to refer to the provisions of Part C and federal regulations promulgated pursuant to Part C. (42 U.S.C. § 1395w-26(b)(3); see 42 C.F.R. § 422.402; *Do Sung Uhm v. Humana, Inc.* (9th Cir. 2010) 620 F.3d 1134, 1148, fn. 20 (*Uhm*).) We read the words "shall supersede" as commanding that these federal statutory

---

[3] Quishenberry urges us to apply a presumption against preemption. We decline to do so. (See *Puerto Rico v. Franklin Cal. Tax-Free Trust* (2016) 579 U.S. 115, 125 ["[B]ecause the statute 'contains an express preemption clause,' we do not invoke any presumption against preemption but instead 'focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent' "].)

provisions and regulations be given preemptive effect. (Cf. *Betancourt v. Storke Housing Investors* (2003) 31 Cal.4th 1157, 1163 ["shall supersede" language in the Employee Retirement Income Security Act of 1974 (ERISA) creates preemption]; *Rush Prudential HMO, Inc. v. Moran* (2002) 536 U.S. 355, 364 [same].) We accordingly interpret the phrase "[t]he standards established under this part shall supersede" as reflecting Congress's intent that the provisions of Part C and federal regulations established under Part C preempt at least some state-law duties. (42 U.S.C. § 1395w-26(b)(3).) This much the parties do not dispute.

The balance of the preemption provision identifies what is preempted by the standards established under Part C — "any State law or regulation . . . with respect to MA plans which are offered by MA organizations under this part" — and also what Congress has exempted from preemption — "State licensing laws or State laws relating to plan solvency." (42 U.S.C. § 1395w-26(b)(3).) Quishenberry does not contend that his claims implicate licensing laws or solvency-related laws. Our task therefore is to determine whether the standards established under Part C preempt the state-law duty on which Quishenberry's claims concerning his father's MA plan is based. (*Ibid.*)

We start by considering Quishenberry's arguments concerning the domain preempted. (See *Medtronic, supra*, 518 U.S. at p. 484.) He contends this domain does not encompass state-law duties that duplicate federal duties, common-law claims such as his negligence and wrongful death claims, or claims based on generally applicable state statutory law such as his claim under the Elder Abuse Act. We discuss each of these arguments in turn.

### 1. *The Provision Expressly Preempts Duplicative State-Law Duties*

Quishenberry argues that there is no express preemption of a state-law duty that is "based on federal standards" established under Part C.  For a claim rooted in duties established under federal law to be actionable under state law, there must be a *state*-law duty to comply with *federal* law; state law must incorporate federal law such that the federal duties are enforceable via a state-law claim.  (See *Riegel v. Medtronic, Inc.* (2008) 552 U.S. 312, 324 (*Riegel*) ["[C]ommon-law liability is 'premised on the existence of a legal duty,' and a tort judgment therefore establishes that the defendant has violated a state-law obligation"].)  Quishenberry would have us read the Part C preemption provision as not extending to state-law duties that, in this way, are based on and duplicate federal standards established under Part C.

The provision's plain language does not support Quishenberry's proposed reading.  By using the expansive word "any" to describe the domain of state standards preempted, Congress indicated its intent that standards established under Part C preempt "any" state-law duty "with respect to MA plans," even when the duty is based on and duplicative of a federal standard.  (42 U.S.C. § 1395w-26(b)(3).)  The intent to preempt duplicative state-law duties is apparent when we contrast the Part C preemption provision's language — superseding "any State law or regulation . . . with respect to MA plans" (*ibid*.) — with the language of the Federal Food, Drug, and Cosmetic Act's preemption provision related to medical devices.  That provision specifies that state-law duties that are "different from, or in addition to" federal requirements are preempted.  (21 U.S.C. § 360k(a)(1).)  In *Medtronic*, the United States Supreme Court

held this provision's preemptive domain did not extend to "state rules that merely duplicate some or all of [the] federal requirements." (*Medtronic, supra*, 518 U.S. at p. 495.) By contrast, the phrase "any state law or regulation" in the Part C preemption provision suggests that Congress did not intend to narrowly preempt only those state-law standards that are inconsistent with the federal standards. (42 U.S.C. § 1395w-26(b)(3).) Instead, it intended the standards established under Part C to supersede "any" state standards "with respect to MA plans," including those that are based on and duplicative of standards established under Part C. (*Ibid.*)

The legislative history of the Part C preemption provision confirms this reading. When first enacted in 1997, Medicare Part C included a differently worded express preemption clause (see Pub.L. No. 105-33, § 1856(b)(3) (Aug. 5, 1997) 111 Stat. 251). The 1997 version of the clause specified that federal standards superseded a state law or regulation "to the extent such law or regulation is inconsistent with such standards." (*Ibid.*) Congress enacted the current version of the provision in a section of the Medicare Prescription Drug Improvement and Modernization Act of 2003 titled "Avoiding duplicative State regulation." (Pub.L. No. 108-173 (Dec. 8, 2003) 117 Stat. 2066, § 232.) The 2003 amendment removed the requirement that a state law be "inconsistent with" federal standards. (*Ibid.*) By removing that requirement, Congress made clear its intent not to limit preemption to state-law claims that are inconsistent with federal standards. (*Medicaid & Medicare Advantage Prods. Ass'n of P.R., Inc. v. Hernandez* (1st Cir. 2023) 58 F.4th 5, 12 (*Hernandez*); *Uhm, supra*, 620 F.3d at pp. 1149–1150.) The current version of the provision thus extends preemption to

state-law standards that are based on and duplicative of standards established under Part C.

### 2. *The Provision's Scope Extends to Common-Law Claims*

Quishenberry next contends that the Part C preemption provision does not preempt common-law claims and instead preempts only claims brought under state statutes and regulations. The provision's plain language contradicts Quishenberry's interpretation. The phrase "*any* State law or regulation" is most naturally read to encompass common law. (42 U.S.C. § 1395w-26(b)(3), italics added.) The narrow nature of the provision's savings clause confirms that Congress intended standards established under Part C to supersede state-law duties regardless of whether they are rooted in statutory or common law. The savings clause designates two specific areas of state law to be preserved from preemption — "State licensing laws" and "State laws relating to plan solvency" — and no others. (42 U.S.C. § 1395w-26(b)(3).) Preemption provisions in other federal statutes, by contrast, contain exemptions for much broader categories of state-law duties. For example, the Federal Boat Safety Act of 1971 (FBSA) contains a savings clause that preserves "liability at common law or under State law." (46 U.S.C. § 4311(h); see *Sprietsma, supra,* 537 U.S. at p. 63.) Similarly, the savings clause of the Occupational Safety and Health Act of 1970 preserves, among other rights, any "common law or statutory rights, duties, or liabilities of employers and employees under any law with respect to injuries, diseases, or death of employees arising out of, or in the course of, employment." (29 U.S.C. § 653(b)(4).) The fact that Congress chose to identify only two categories of state statutory law as preserved from preemption — and chose not to specify that

common law duties are exempt — suggests it did not intend to categorically exempt common law duties.[4]

The preemption provision's legislative history also suggests that Congress did not intend to preserve common law duties from preemption. Prior to the 2003 amendment, Health and Human Services had interpreted the original preemption provision as foreclosing common law claims that are, in effect, claims that certain services are covered under an MA plan. (65 Fed.Reg. 40170, 40261 (June 29, 2000); see *Uhm, supra,* 620 F.3d at p. 1155.) We presume that Congress was aware of the Secretary's interpretation when it amended the preemption clause in 2003. (*Uhm,* at p. 1155.) Because Congress did not act to correct Health and Human Services' understanding when making this amendment, it appears "that Congress intended the Part C preemption provision . . . to preempt at least some common law claims." (*Ibid.*)

CMS's position on the meaning of the amended version of the Part C preemption provision also accords with our understanding. When issuing a proposed rule implementing the 2003 amendment, CMS stated that: "[G]enerally applicable

---

[4]    This conclusion is consistent with the great weight of federal and sister state authority on the preemptive effect of the Part C preemption provision and the identical preemption provision in Part D of the Medicare Act (42 U.S.C. § 1395w-112(g)). (See, e.g., *Hernandez, supra,* 58 F.4th at pp. 11–13; *Aylward v. SelectHealth, Inc.* (9th Cir. 2022) 35 F.4th 673, 681 (*Aylward*); *Pharm. Care Mgmt. Ass'n v. Wehbi* (8th Cir. 2021) 18 F.4th 956, 971–972; *Uhm, supra,* 620 F.3d at pp. 1153–1156; *Haaland v. Presbyterian Health Plan, Inc.* (D.N.M. 2018) 292 F.Supp.3d 1222, 1230–1231; *Morrison v. Health Plan of Nev. Inc.* (Nev. 2014) 328 P.3d 1165, 1171–1172; *Snyder v. Prompt Med. Transp., Inc.* (Ind.Ct.App. 2019) 131 N.E.3d 640, 652–653.)

State tort, contract, or consumer protection law would not be preempted" because the preemption provision "was intended to preempt state standards governing health plans, not generally applicable State laws" or "contract laws and tort laws." (69 Fed.Reg. 46866, 46913 (Aug. 3, 2004).) However, CMS clarified this position when it promulgated the final rule, concluding that "all State standards, *including those established through case law*, are preempted to the extent they specifically would regulate MA plans, with exceptions of State licensing and solvency laws. Other State health and safety standards, or generally applicable standards, that do not involve regulation of an MA plan are not pree[mp]ted." (70 Fed.Reg. 4588, 4665 (Jan. 28, 2005), italics added; see *Uhm, supra*, 620 F.3d at p. 1156.) The final rule thus clarified CMS's view that, as to the regulation of MA plans, federal standards established under Part C supersede duties established under common law.

In support of his argument that the Part C preemption provision does not reach common law duties, Quishenberry relies on the Court of Appeal's decisions in *Yarick* and *Cotton*, which read the portion of the provision identifying what is preempted — " 'any State law or regulation' " — to exclude common law. (*Yarick, supra*, 179 Cal.App.4th at p. 1165; see also *Cotton, supra*, 183 Cal.App.4th at pp. 449–451.) *Yarick*'s discussion of the scope of express preemption under Part C is notably brief: The court observed that language like that found in Part C "usually is interpreted to preempt only 'positive state enactments,' that is, laws and administrative regulations, but not the common law." (*Yarick*, at pp. 1165–1166.) In support of this observation, the *Yarick* court cited, without discussion, the United States Supreme Court's decision in *Sprietsma, supra,* 537 U.S. 51, which interpreted a differently worded express

preemption provision in the FBSA as not reaching common-law tort claims. (*Id*. at p. 64.) In *Cotton*, the Court of Appeal relied on *Yarick* and *Sprietsma* to conclude that the Part C preemption provision was inapplicable to common-law claims. (*Cotton*, *supra*, 183 Cal.App.4th at p. 450.) The Court of Appeal in *Roberts, supra*, 2 Cal.App.5th at pp. 144–145 disagreed, rejecting *Sprietsma*'s reasoning as largely irrelevant to the interpretation of the Part C preemption provision. We conclude the *Roberts* panel has the better view: The U.S. Supreme Court's reasoning in *Sprietsma*, which is based on the distinct language and statutory context of the FBSA preemption provision, does not control our analysis.

The preemption provision at issue in *Sprietsma* reads: " '[A] State . . . may not establish, continue in effect, or enforce a law or regulation establishing a recreational vessel or associated equipment performance or other safety standard . . . that is not identical to a regulation' " prescribed under the FBSA. (*Sprietsma, supra,* 537 U.S. at pp. 58–59, quoting 46 U.S.C. § 4306.) In support of its holding that this provision did not reach common-law duties, the U.S. Supreme Court observed that "the article 'a' before 'law or regulation' implies a discreteness — which is embodied in statutes and regulations — that is not present in the common law." (*Sprietsma*, at p. 63.) The Part C preemption provision, by contrast, applies to "*any* State law or regulation" concerning MA plans, suggesting a broader preemptive effect. (42 U.S.C. § 1395w-26(b)(3), italics added; see *Uhm, supra*, 620 F.3d at p. 1153 ["The [Part C preemption provision's] use of 'any' negates the 'discreteness' that the Court identified in *Sprietsma*"].) As noted above, the FBSA also contains a savings clause specifying that FBSA compliance "does not relieve a person from liability at common law or under

State law." (46 U.S.C. § 4311(h).) The U.S. Supreme Court considered this clause evidence that the language of the FBSA preemption provision " 'permits a narrow reading that excludes common-law actions.' " (*Sprietsma*, at p. 63.) The Medicare Act contains no equivalent savings clause or any other affirmative indication that Congress intended to preserve common-law duties. (See *Uhm*, at p. 1153.) For these reasons, we agree with the *Roberts* panel that *Sprietsma* is distinguishable. (*Roberts, supra*, 2 Cal.App.5th at pp. 144–145.) We accordingly conclude that the scope of the Part C preemption provision extends to common-law duties.

3. *The Provision's Scope Extends to Duties Established by State Laws Not Specifically Targeted at MA Plans*

Quishenberry also argues, relying on *Cotton*, that the phrase "with respect to MA plans" in the Part C preemption provision indicates that the provision does not expressly preempt claims based on state "statutes of general applicability," such as his claim under the Elder Abuse Act. (See *Cotton, supra*, 183 Cal.App.4th at p. 450 [Part C preemption provision "extends only to positive state laws or regulations 'with respect to MA plans.' "].) Quishenberry would have us construe the provision as reaching only those state statutes and regulations that specifically refer to and target MA plans. By contrast, UnitedHealthcare and Healthcare Partners argue that standards established under Part C preempt even those state standards that are set out in generally applicable laws. They understand the phrase "with respect to MA plans" to indicate that the preemptive effect is limited to state-law standards concerning MA plans offered by MA organizations; standards governing other types of health plans are not preempted.

(42 U.S.C. § 1395w-26(b)(3).) We conclude that UnitedHealthcare and Healthcare Partners offer the better reading.

The U.S. Supreme Court addressed a similar question in *Riegel*, in which it interpreted the phrase " 'with respect to' " in the preemption clause of the 1976 Medical Device Amendments to the Federal Food, Drug, and Cosmetic Act. (*Riegel, supra* 552 U.S at p. 316.) The relevant statutory language read: " '[N]o State or political subdivision of a State may establish or continue in effect *with respect to* a device intended for human use any requirement. . . .' " (*Ibid.*, italics added.) The court rejected the argument that state tort duties were not preempted because they were "not requirements maintained ' "*with respect to* devices." ' " (*Id.* at p. 327, italics added.) It concluded that "[n]othing in the statutory text suggests that the pre-empted state requirement must apply *only* to the relevant device, or only to medical devices and not to all products and all actions in general." (*Id.* at p. 328; cf. *Pilot Life Ins. Co. v. Dedeaux* (1987) 481 U.S. 41, 47–48 [interpreting the phrase "relate to" in ERISA's preemption provision as "not limited to 'state laws specifically designed to affect employee benefit plans' "].)

Similar reasoning applies to the Part C preemption provision: The phrase "with respect to" does not indicate that only those state laws and regulations that specifically refer to MA plans are preempted. The standards established under Part C preempt even those duties set out in generally applicable state statutes, but only as they apply to "MA plans which are offered by MA organizations." (42 U.S.C. § 1395w-26(b)(3); see *Uhm, supra*, 620 F.3d at p. 1150, fn. 25; *Roberts, supra*, 2 Cal.App. at p. 47; cf. *Rutledge, supra*, 141 S.Ct. at pp. 479-481 [describing the scope of the requirement that state laws, to be preempted by

ERISA, must "relate to any employee benefit plan"].)[5]  As CMS explained in the final rule implementing the 2003 amendment, discussed above, federal standards established under Part C supersede "*all State standards . . .* to the extent they specifically would regulate MA plans," other than "State licensing and solvency laws."  (70 Fed.Reg., *supra*, at p. 4665, italics added). These include state statutory or regulatory provisions that specifically reference MA plans *and* duties established under generally applicable state law when invoked to regulate MA plans.  (*Id*.)

In sum, contrary to Quishenberry's contentions, Congress did not categorically carve out and save from preemption state-law claims based on duties that duplicate federal standards, common law actions, or statutes of general applicability. Instead, it intended the standards established under Part C to supersede any state-law duty with respect to MA plans, regardless of whether that duty is grounded in statutory or common law, and even when the state-law duty is not inconsistent with and instead is based on and duplicates standards established under Part C.

## C. Quishenberry's Claims Are Expressly Preempted

We next consider whether Quishenberry's claims fall within the domain preempted by Part C's preemption provision. (See *Medtronic, supra,* 518 U.S. at p. 484; *Aylward, supra,*

---

[5]   We disapprove *Yarick v. PacfiCare of California, supra,* 179 Cal.App.4th 1158, and *Cotton v. StarCare Medical Group, Inc., supra,* 183 Cal.App.4th 437 to the extent they conclude that the scope of Part C's preemption provision is limited to positive state enactments.  We also disapprove *Cotton* to the extent it concludes that the Part C preemption provision only reaches state laws and regulations specifically targeting MA plans.

35 F.4th at p. 680.) The touchstone of this inquiry is whether there is a federal standard under Part C that supersedes the duty alleged under state law or regulation. To make this determination, we compare the state-law duties Quishenberry seeks to enforce to standards established under Part C. (See *Aylward,* at p. 680.)

Quishenberry's operative second amended complaint sets out claims under the state Elder Abuse Act and the common law. He supports these claims with allegations that UnitedHealthcare — his father's HMO MA plan — and Healthcare Partners — a healthcare services administrator — failed to ensure that his father's physician and skilled nursing facility provided the benefits to which he was entitled under Part C, resulting in his discharge from the skilled nursing facility under circumstances in which Medicare rules required that he remain there for an additional 76 days. As pled against these entities, therefore, Quishenberry's claims are ultimately premised on a single alleged duty: The duty to ensure his father received the services to which he was entitled under Part C and the terms of his MA plan, specifically, 100 days of skilled nursing facility care.[6]

To determine the truth of Quishenberry's allegations, a state factfinder would have to decide whether Quishenberry's father was entitled to the skilled nursing care benefits Quishenberry claims his father should have received. This would involve applying standards established under Part C. MA

---

[6] Quishenberry does not dispute the Court of Appeal's determination that the same federal duties apply to Healthcare Partners and UnitedHealthcare; our analysis assumes that determination is correct.

regulations require organizations to provide MA enrollees the benefits to which they are entitled under Parts A and B. (See 42 U.S.C. § 1395w-22(a)(1)(A) [MA plan "shall provide to" enrollees "through providers and other persons . . . benefits under the original medicare fee-for-service program option"]; 42 C.F.R. § 422.101(a) [MA organizations must "[p]rovide coverage of, by furnishing, arranging for, or making payment for, all services that are covered by Part A and Part B"].) Quishenberry's claims are based on Part A's provision of coverage for "post-hospital extended care services for up to 100 days during any spell of illness." (42 U.S.C. § 1395d(a)(2)(A).) To determine whether Quishenberry's father was entitled to the full 100 days of skilled nursing facility care under this provision, a state factfinder would need to apply criteria detailed in Medicare regulations, for example: "[T]he beneficiary must require skilled nursing or skilled rehabilitation services, or both, on a daily basis" and "[t]he daily skilled services must be ones that, as a practical matter, can only be provided in a [skilled nursing facility], on an inpatient basis." (42 C.F.R. § 409.31(b)(1) & (b)(3).) To determine whether UnitedHealthcare and Healthcare Partners had a duty to ensure the provision of these services, state courts would look to standards established under Part C governing the duties of Medicare Advantage organizations. (See, e.g., 42 C.F.R. § 422.504(a)(3)(i) [requiring MA organizations, as part of their contracts with the Centers for Medicare and Medicaid Services, to agree to provide "[t]he basic benefits as required under [42 C.F.R.] § 422.101"]; 42 C.F.R. § 422.752(a)(1) [authorizing the imposition of sanctions against MA organizations that "[f]ail[] substantially to provide medically necessary items and services" required by law or contract].) UnitedHealthcare and HealthCare Partners'

liability therefore hinges on a determination of noncompliance with a duty rooted in federal standards established under Part C. (See *Riegel*, *supra*, 552 U.S. at p. 324 [explaining how federal standard may be enforceable under state law].) Because the state-law duty Quishenberry alleges is ultimately based on these standards, his claims are preempted. (42 U.S.C. § 1395w-26(b)(3).)

Attempting to save his claims from preemption, Quishenberry characterizes them as "based on treatment decisions, not benefits determinations." He points to his allegations that UnitedHealthcare and Healthcare Partners "acquiesced to, encouraged, directed, aided and abetted" the decision of the skilled nursing facility and doctor not to provide covered services to his father to reduce costs and increase profits. Quishenberry's complaint makes clear, however, that the resolution of his claims against UnitedHealthcare and Healthcare Partners would ultimately turn on the determination whether his father qualified for additional skilled nursing facility care under Part C and related regulations. In support of his claims against these entities, Quishenberry alleges "Medicare rules required that" his father remain at the skilled nursing facility "for more intense attention to his health care needs," "Medicare rules make provision for longer periods for participation in physical therapy given the presence of [his father's] pressure sores," and specifically, he alleges that his father was "entitled under Medicare to another period of 76 days of care at [the skilled nursing facility] with daily care of his pressure sores and daily physical therapy." To find UnitedHealthcare or Healthcare Partners liable for breach of the alleged duty to ensure he received these services, a factfinder would have to apply the standards established under

Part C to determine whether his father was entitled to them. Quishenberry's claims, therefore, are based on state-law duties that are duplicative of standards established under Part C.

For these reasons, we conclude that Part C's preemption provision expressly preempts Quishenberry's claims against UnitedHealthcare and Healthcare Partners.[7]  In so concluding, we note again that Quishenberry's claims against his father's skilled nursing facility and treating physician are not before us; this appeal is concerned with the liability of the provider and the administrator of an MA plan.  Quishenberry's allegations against these entities are not based on treatment decisions (which they did not make) or provision of care (which they did not undertake) but instead on their duties under Part C and related regulations to ensure Quishenberry's father received the benefits to which he was entitled under his MA plan.  Because Quishenberry's state-law claims against UnitedHealthcare and Healthcare Partners are based on duties arising under Part C, they are preempted.[8]

---

[7]  Because we conclude that Quishenberry's claims are expressly preempted, we do not address the alternative implied preemption arguments made by UnitedHealthcare and Healthcare Partners.

[8]  The Attorney General submitted an amicus curiae brief cautioning against an overly broad reading of the Part C preemption provision that would impinge on the State's ability to protect California's millions of Medicare beneficiaries though various state-law enforcement actions.  He argues that "Congress did not intend to provide MA plans with blanket immunity from basic health and safety obligations grounded in state law that apply to all persons and entities statewide, or other generally applicable laws that do not undermine the administration of the

### III. Conclusion

For the reasons discussed above, Quishenberry's claims are expressly preempted by Medicare Part C's preemption provision. Accordingly, we affirm the Court of Appeal's judgment.

**GROBAN, J.**

**We Concur:**

**GUERRERO, C. J.**
**CORRIGAN, J.**
**LIU, J.**
**KRUGER, J.**
**JENKINS, J.**
**EVANS, J.**

---

federal MA program." We agree. This case does not directly implicate the Attorney General's enforcement powers and nothing we say here would provide MA plans with blanket immunity from basic health and safety obligations grounded in state-law standards or in other state laws and regulations that are not superseded by standards established under Part C.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  Quishenberry v. UnitedHealthcare, Inc.

_____

**Procedural Posture** (see XX below)
**Original Appeal**
**Original Proceeding**
**Review Granted (published)**
**Review Granted (unpublished)** XX NP opn. filed 9/21/21 – 2d Dist., Div. 7
**Rehearing Granted**

_____

**Opinion No.** S271501
**Date Filed:** July 13, 2023

_____

**Court:**  Superior
**County:**  Los Angeles
**Judge:**  Ralph C. Hofer

_____

**Counsel:**

Balisok & Associates and Russell S. Balisok for Plaintiff and Appellant.

Gibson, Dunn & Crutcher, Kahn A. Scolnick, Heather L. Richardson, Jennafer M. Tryck, Patrick J. Fuster; Walraven & Westerfeld, Bryan S. Westerfeld, Jessica B. Hardy; Carroll, Kelly, Trotter & Franzen, Michael J. Trotter, Brenda M. Ligorsky and David P. Pruett for Defendants and Respondents.

Cole Pedroza, Curtis A. Cole and Cassidy C. Davenport for California Medical Association, California Dental Association and California Hospital Association as Amici Curiae on behalf of Defendants and Respondents.

King & Spalding, Ethan P. Davis and Matthew V.H. Noller for Chamber of Commerce of the United States of America as Amicus Curiae on behalf of Defendants and Respondents.

Fred J. Hiestand for Civil Justice Association of California as Amicus Curiae on behalf of Defendants and Respondents.

Rob Bonta, Attorney General, Renu R. George, Assistant Attorney General, Kathleen Boergers, Bryan Kao and Anna Rich, Deputy Attorneys General, for the Attorney General of California as Amicus Curiae.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Russell S. Balisok
Balisok & Associates, Inc.
37592 Zeolite Hills Road
Corvallis, OR 97330
(818) 389-7890

Kahn A. Scolnick
Gibson, Dunn & Crutcher LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
(213) 229-7656